# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Samuel Der-Yeghiayan | Sitting Judge if Other than Assigned Judge | Sheila Finnegan |
|---|---|---|---|
| **CASE NUMBER** | 09 C 1735 | **DATE** | 4/5/2011 |
| **CASE TITLE** | Danny J. Ruffin, et al. vs. Exel Direct, Inc. | | |

**DOCKET ENTRY TEXT**

For the reasons discussed in the attached Written Opinion **[126]**, Plaintiffs' oral motion to compel additional documents is denied.

■[ For further details see text below.]

Mailed notice.

---

# STATEMENT

Plaintiffs Danny J. Ruffin and Steven Baker (collectively "Plaintiffs") allege that Defendant Exel Direct, Inc. ("Exel") breached a contract by failing to pay them the agreed-upon compensation for deliveries that they made. On November 30, 2010, the District Judge granted Plaintiffs' motion to compel certain discovery. Exel produced additional documents on December 14, 2010 and January 10, 2011. During a hearing before the District Judge on January 12, 2011, Plaintiffs argued that the supplemental production was insufficient and asked that more documents be produced. Exel asserted that it already had produced more than enough information. The District Judge referred the matter to this Court for further consideration. For the reasons stated below, the Plaintiffs' request for additional documents is denied.

## Background

A.     The Parties: Exel is a corporation that makes deliveries of merchandise on behalf of retailers. Plaintiffs provided services to Exel as delivery drivers working as independent contractors out of Exel's Thornton, Illinois site. That site had one client - Sears - for which Exel drivers delivered appliances, electronics, furniture, and other items to Sears' customers. Plaintiff Ruffin made deliveries from February 2007 until February 2009 pursuant to an "Independent Truckman's Agreement" ("ITA") between Exel and Ruffin's company called "J is L Trucking." Plaintiff Baker made deliveries from mid-May 2006 until December 2007 pursuant to an ITA between Exel and Baker's company called "The Baker Bunch Corporation." Under the ITAs, Exel was required to pay Plaintiffs a minimum of 60% of "hauling revenue" as "interpreted in accordance with [Exel's] established accounting practices and past practices." The contract excluded from hauling revenue any compensation for "services above and beyond basic delivery services" and gave examples of such services. In addition to the ITAs, Plaintiffs signed separate agreements with Exel that allowed Exel to deduct funds from their compensation to

cover liability insurance, a performance bond, random drug/alcohol testing, and administrative fees. (Doc. 122-6, 122-7.)

B.     The Claims: Plaintiffs' claims against Exel have evolved over time. They initially filed a putative class action complaint on March 20, 2009 on behalf of all of Exel's Illinois-based delivery drivers over the past ten years. The complaint centered around one primary allegation—that Exel improperly classified Plaintiffs as independent contractors rather than as employees. Plaintiffs alleged that Exel had been unjustly enriched by the improper classification because it failed to reimburse drivers for work-related expenditures while denying those same drivers "wages, holiday pay, overtime pay, workers' compensation and unemployment insurance, and contributions to Exel Direct retirement plans." (Doc. 1, ¶ 49.) Plaintiffs alleged (among other things) that they were required to pay for operating expenses incurred for the benefit of Exel such as delivery vehicle purchase and depreciation, insurance of various types, delivery vehicle maintenance and repairs, and purchase and maintenance of logs, signage, uniforms and fuel. (Doc. 1, ¶ 11.) Based on such allegations, Plaintiffs brought claims for unjust enrichment, as well as for violations of the Illinois Minimum Wage Law and Illinois Wage Payment and Collection Act. They also sought an accounting, alleging that they did not know the "precise amount of compensation due to each Plaintiff and Plaintiff Class Members." (Id. at ¶ 53.) On September 29, 2009, the District Judge granted a motion to dismiss the unjust enrichment claim because the allegations related directly to the terms and conditions of the parties' relationship which was governed by the ITAs. He also dismissed Plaintiffs' claim for an accounting and for injunctive relief and a declaratory action. (Doc. 22, at 2.)

On January 11, 2010, Plaintiffs filed an Amended Complaint in which they acknowledged that they were independent contractors and alleged only that Exel had breached a contract by failing to pay them all compensation due under the ITAs. They sought to represent a class of similarly situated independent contractors. (Doc. 45.) More recently, Plaintiffs have said they do not seek to represent a class and "this case has become [and will remain] a law suit concerning the two named Plaintiffs for breach of contract and other relief." (Doc. 118, at 2, n.3.)

## Motions to Compel

On September 30, 2010, the day discovery closed, Plaintiffs filed their first motion to compel (Doc. 84), and also issued a Rule 30(b)(6) deposition notice. The motion to compel complained that discovery responses served in March 2010 (in response to the first set of interrogatories and document requests) were inadequate and sought to compel answers to Interrogatories 8(a) through 8(d) and document requests 2, 5, 7-13, 20-26 and 44. Plaintiffs also sought to compel supplemental responses to interrogatories 2 and 3 and document requests 2, 3 and 6 from a second set of interrogatories and documents requests served on August 2, 2010.

During the hearing on October 13, 2010, Plaintiffs' counsel acknowledged that his clients had no idea whether they had been underpaid or not and sought to learn this through the discovery. Exel argued that they already had produced sufficient documents for Plaintiffs to determine this. This Court entered an order requiring the parties to meet and confer in an effort to reach agreement on the additional discovery that Plaintiffs sought. The Court also gave Plaintiffs the opportunity to file a supplemental brief "describing with particularity what information is needed and why." (Doc. 90.)

On October 25, 2010, Plaintiffs' counsel filed a motion to withdraw (citing irreconcilable differences with his clients regarding litigation strategy), and for an extension of time to file the

supplemental brief since Plaintiffs needed to retain new counsel. (Doc. 91.) On November 2, 2010, the newly assigned District Judge[1] granted the motion to withdraw and gave leave to new counsel to substitute and file their appearances. He also struck the motion to compel but gave Plaintiffs until November 16, 2010 to file a new motion to compel, describing "with particularity what information is needed and why...." (Doc. 96.)

On November 16, 2010, Plaintiffs filed another motion to compel, though it was identical in most respects to the prior one. (Doc. 98.) On November 30, 2010, the District Judge granted the motion to compel and gave Exel until December 14, 2010 (later extended to January 11, 2011) to provide Plaintiffs with additional information. Exel produced more documents on December 14, 2010 and January 10, 2011. During a hearing on January 12, 2011, Plaintiffs' counsel argued that the supplemental production was not adequate. Defense counsel disagreed. The discovery dispute was then referred to this Magistrate Judge for resolution.

When the parties appeared before this Court on January 20, 2011, Plaintiffs said that all they were looking for were "backup" or "foundational" documents that support purported revenue expenses and deductions. When this Court asked for an example, Plaintiffs identified gas receipts, observing that this reduces the amount paid to the driver. When the Court asked how many different items like this would be needed, counsel said there were many and that Plaintiffs basically wanted to audit the expenses. Exel argued that a request for "foundational" documents was too vague and would cover every document at the facility. Exel also argued that it already had produced the information that was needed and suggested that Plaintiffs have a forensic accountant review the existing materials and then identify specific documents that they believed to be necessary. Plaintiffs said that they planned to work with an accountant and would prepare a list of specific documents. As a result, this Court gave Plaintiffs considerable additional time, until February 17, 2011, to prepare the list. The Court cautioned Plaintiffs to be as narrow and specific as possible in describing the documents. In its docket order, this Court also stated that Plaintiffs should be prepared at the hearing to "explain with specificity how they will use the specific information that is sought." (Doc. 113.)

Plaintiffs provided a list to Exel on February 18, 2011. Despite having almost four weeks to work with an accountant in preparing the list, Plaintiffs were neither narrow or specific in describing the additional document that they felt were needed. Instead Plaintiffs again made a broad request for all revenue and expense items:

1.   All billings sent to Sears and checks received from Sears reflecting Exel's gross earnings on the deliveries handled by Ruffin and Baker during 2006-2010.

2.   All expense-related invoices and payment records reflecting Exel's deductions for expenses on the 1099's sent to Ruffin and Baker during 2006-2010.

3.   Copies of all 1099's sent to Ruffin and Baker during 2006-2010.

(Doc. 114-2.) Oddly, Plaintiffs apparently were unaware that 1099s had not been issued to them by Exel (since they worked for their own companies when making deliveries). In addition, the list inexplicably sought documents related to deliveries by Plaintiffs over a five-year period even though they only made deliveries for two years or less.

During the hearing on February 24, 2011, this Court expressed its frustration at the lack of

specificity in Plaintiffs February 18, 2011 list. The Court also questioned whether Plaintiffs were challenging Exel's methodology for determining hauling revenue (e.g., what it included and excluded from hauling revenue) or just the calculations. Plaintiffs were given one final chance to identify in writing the specific documents that were needed and why. The Court gave the example that Plaintiffs might request specific documents relating to fuel such as the forms that drivers filled out with the mileage for each delivery (Sears paid for fuel based on mileage and all of these payments were included as hauling revenue). The Court's written order entered on February 24, 2011 stated (in pertinent part):

> Plaintiffs' February 18, 2011 list of documents did not provide the specificity requested by this Court during the hearing on 1/20/2011. Plaintiffs are given until 3/10/2011 to file a document setting forth specific revenue and expense (or other) documents that they seek along with an explanation of why, in light of the methodology for determining compensation set forth in Exhibit A of the Independent Trucking Agreement or elsewhere, these documents are relevant. To the extent that Plaintiffs disagree with the methodology by which Defendant calculates "hauling revenue" (e.g., the specific revenue items from Sears that are included or deductions taken), Plaintiffs are to explain how they disagree and why.

In response to the order, Plaintiffs filed a ten-page memorandum on March 15, 2011. Once again, Plaintiffs failed to identify any specific documents that they sought. Rather, the memorandum asked for "actual Sears' payment records for the contract periods of the Plaintiffs" and "foundational documents sufficient to establish a baseline amount of revenue" from Sears. (Doc. 118, at 7, 9.) Plaintiffs also inexplicably (and inaccurately) stated that "virtually every document" produced by Exel had been created by the attorneys using Desktop Publishing software. (*Id.* at 4.)

## Discussion

Based on this Court's examination of the materials produced by Exel (described in detail below), Plaintiffs have the information and documents necessary to determine what Sears paid to Exel for deliveries made by Plaintiffs. With the exception of a powerpoint that was created in an attempt to assist Plaintiffs in understanding the flow of funds, these documents were *not* created by attorneys but are pre-existing business records. While Plaintiffs contend that they need additional documents (Sears payments records) so they can compare the total amount that Sears paid Exel for Plaintiffs' deliveries with what Exel in turn paid Plaintiffs, they are unable to explain why such payment records would be helpful. Any payments from Sears would represent bulk payments for *all* deliveries by *all* drivers from the Thornton site over a certain period of time for such things as labor or fuel or fixed expenses, so records of these payments would be of no use in ascertaining the total amount that Sears paid for any particular delivery made by Plaintiffs. Moreover, the ITAs did not state that Plaintiffs would receive a minimum of 60% of total revenues from Sears. Rather they said Plaintiffs would receive a minimum of 60% of hauling revenue which was defined in such a way that Exel included only 30% of Sears' payments for miscellaneous fixed expenses and did not include any of the management fee paid by Sears. Therefore, Plaintiffs are incorrect in suggesting that they can prove a breach simply by comparing what Sears paid Exel for the deliveries made by Plaintiffs with what Exel in turn paid

Plaintiffs (to determine whether this was at least 60%).

In order to explain what Exel received from Sears for deliveries, and paid to Plaintiffs pursuant to the ITAs, as well as why the additional documents that Plaintiffs seek are unnecessary, this Court summarizes the pertinent contracts and documents.

**A.** **Agreements between Exel and Plaintiffs**: The Independent Truckman's Agreement that Plaintiffs signed with Exel on behalf of their respective companies stated that "CONTRACTOR shall receive payment for services in accordance with the schedule attached as Exhibit A." Exhibit A stated that the Contractor was to receive a minimum of 60% of "hauling revenue" and defined that term as follows:

> The term "hauling revenue" shall be interpreted in accordance with [Exel's] established accounting practices and past practices. Hauling revenue does not include compensation for services above and beyond basic delivery services. For example, compensation for routing and supervision, overhead, customer relations, order fulfillment, pre-notification, cross-dock operations, transportation management, intercompany transfer and warehouse operations, among other things, are not considered elements of hauling revenue.

(Doc. 122, at 5.) Exel provided Plaintiffs with a list of what it included (and excluded) when calculating hauling revenue. (Doc. 122-4, at 4.) As is discussed in further detail below, most but not all of the payments from Sears were included as hauling revenue. Exel excluded from hauling revenue 70% of what Sears paid for Exel's miscellaneous expenses (e.g., Exel's supervisor and clerical payroll), as well as the entire monthly management fee that Sears paid to Exel. (Doc. 122-4, at 4; Doc. 122-5, at 4, 9.)

In addition to the ITAs, Plaintiffs signed separate agreements with Exel in which they allowed Exel to deduct amounts from their compensation to cover liability insurance, a performance bond, random drug/alcohol testing, and administrative fees. (Doc. 122-6, 122-7.)

**B.** **Agreement between Exel and Sears**: What Sears agreed to pay Exel for deliveries is set forth in the Sears Home Delivery Carrier Agreement ("the Sears Agreement") and attached rate sheets reflecting the required payments for labor, fuel, fixed expenses, etc. and how these payments were calculated. (Doc. 122-3.)

● Labor Expense: Under the Sears Agreement, Sears was required to pay Exel a flat "per Stop" rate for each delivery or attempted delivery as full compensation for all labor costs regardless of the actual amount of time or people required for the stop. (Doc. 122-3, at 2-3.)[2] This base rate for each stop during the relevant time period was $20.47, which was set according to Sears' delivery-productivity schedule for its contract delivery companies. (Doc. 122-3, at 10, 11.) The agreement required Exel to submit a weekly invoice for all labor charges under the "per-stop rate." (Doc. 122-3, at 14.) Exel included as hauling revenue for purposes of the ITAs the entire $20.47 per stop amount that it received from Sears for each delivery that Plaintiffs made. (Doc. 122-4, at 8.) To

the extent that Sears paid any extra fee for "anti-tip" service (to prevent merchandise from tipping over), this was also included as part of hauling revenue. (Doc. 122-4, at 4.) It is unclear what "foundational" documents Plaintiffs seek (and why) concerning Sears' payments for "labor."

- Fuel Reimbursement: Under the Sears Agreement, Sears was obligated to pay Exel for fuel used in making deliveries at the rate of 7 miles per gallon, using the local average gas price. Exel was required to bill Sears weekly for all fuel, detailing its actual weekly miles (obtained from the drivers), miles per gallon, and the price of the fuel per gallon. (Doc. 122-3, at 4.) For purposes of determining hauling revenue under the ITAs, Exel included all fuel reimbursement from Sears. (Doc. 122-4, at 4.) Plaintiffs have not requested any specific documents pertaining to fuel payments and it is unclear why they would need such documents given what already has been produced.

- Fixed Expenses: The Sears' agreement required Sears to reimburse Exel for fixed expenses as shown on a Rate Worksheet, and the expense was to remain constant at the stated amounts. (Doc. 122-3, at 5.) These fixed expenses were: (1) fixed monthly truck expenses ($27,750); (2) fixed monthly miscellaneous expenses ($39,318); (3) fixed monthly management fee ($11,300); and (4) fixed monthly maintenance expense ($3,835). (Doc. 122-3, at 10; Doc. 122-5, at 7.) Sears paid $2,710 per day to Exel to cover all of these fixed expenses.[3]

Exel included as "hauling revenue" under the ITAs some but not all of the funds that Sears paid toward the fixed expenses. Exel included all of the funds that Sears paid toward the fixed expenses in categories 1 and 4. For category 2 (miscellaneous expenses), Exel only included 30% of what Sears paid. (Doc. 122-4, at 4.) These miscellaneous expenses were items such as property damage, cargo claims, communication; home office; office supplies; travel; fax and copier; supervisor and clerical payroll and benefits, graphics, tolls, uniforms, physicals, drug testing, tools/pads, and background checks. (*Id.;* Doc. 122-3, at 12; Doc. 122-5 at 9.) For category 4 (management fee), none of the funds paid by Sears were included as hauling revenue under the ITAs. (*Id.*; Doc. 122-5, at 4, 9.) The end result was that Exel included $5.43 per stop (of what Sears paid toward fixed expenses) as part of hauling revenue under the ITAs. Exel provided Plaintiffs with the details of how it derived this figure based on what Sears paid and what was (and was not) included as hauling revenue.[4]

- Quarterly incentives: The Sears agreement required Sears to make an incentive payment to Exel for all "attempted stops" in a Sears accounting month if standards on four "Key Productivity Indicators" were met. The incentive was earned monthly but paid to Exel quarterly. (Doc. 122-3, at 5.) Exel included all such incentive payments as part of hauling revenue under the ITAs. (Doc. 122-4, at 5.) During the period when Plaintiffs were making deliveries, the Sears' location in Thornton earned the incentive payment only in the months of October of 2008 ($2,554) and November of 2008 ($2,600). (Doc. 122-5, at 7.)

**C.** **Documents Produced by Exel**: In addition to producing the contracts with Plaintiffs and the contract and rate sheets with Sears that are described above, Exel produced numerous other documents with information concerning revenues from Sears and payments to Plaintiffs. These included:

| STATEMENT |
|---|

1. **Invoice to Sears**: Exel produced an example of an invoice that Exel sent to Sears for Exel's Thornton, Illinois site (EXEL 001506 - 1507). This showed the number of stops made that week, the per-stop rate that Exel billed to Sears, the total miles traveled by Exel's contractor-drivers that week, and the fuel cost that Exel billed to Sears for that mileage. Exel informed Plaintiffs that, if they felt such documents would be useful, Exel would produce a complete set of these weekly invoices for the time period when Plaintiffs made deliveries for Exel.

2. **Supplier Payment History Reports**: Exel produced all of the "Supplier Payment History Reports" showing each Plaintiff's weekly payments and deductions, and the specific nature of each payment and deduction, for their entire contract period with Exel (EXEL 000161 - 280).

3. **Manifest Reports**: Exel produced all of its manifest reports for each Plaintiff showing each daily delivery made by each Plaintiff, how much Exel allocated for payment to each Plaintiff for each delivery, and any other payment allocations made for each Plaintiff for the specific hauling-revenue event identified in the manifest report (i.e. rescheduled delivery, mileage, fuel, fly-bys, etc.) (EXEL 000474 - 903 for Ruffin, EXEL 000904 - 1467 for Baker).

4. **Hauling/Non-Hauling Revenue Information:** Exel produced itemized hauling and non-hauling revenue information (EXEL 000413 - 421), showing (i) the base delivery rate that Sears paid Exel for deliveries made from its Thornton, Illinois branch ($20.47), (ii) all of the actual dollar amounts for each component of hauling revenue (variable and fixed) that Exel used to allocate to its Thornton drivers' compensation beyond the base rate, (iii) the total number of annual "stops," or deliveries, that Exel used to calculate the additional hauling-revenue allocation per delivery beyond the base rate.

5. **Backup computation sheets:** Exel produced certain backup computation sheets for the hauling and non-hauling revenue information (EXEL 001478 - 1485).

6. **Profit/Loss Reports**: Exel produced monthly profit-and-loss reports for each year 2006 through February 2009 for the Thornton site, showing revenue from Sears and expenses in line detail. (Doc. 122-9.)

In light of Exel's production of the documents summarized above, this Court requested Plaintiffs on multiple occasions to identify the specific documents that they sought but had not been produced. The Court even provided an example of what it meant by a "specific document;" it said that Plaintiffs should say (for example) that they needed the forms that the drivers filled out with the mileage for each delivery since Sears paid for fuel based, in part, on the reported miles.[5] Exel argued that no additional records were necessary and made the suggestion that Plaintiffs work with a forensic accountant in identifying specific documents that they felt were still needed. While Plaintiffs apparently retained an accountant to review the Exel documents for five hours on January 25, 2011, the accountant did not identify any specific documents that were necessary. Instead, he signed a short affidavit that said "there are no documents produced by the Defendant which demonstrate the actual amount of hauling revenue paid by Exel Direct to Sears." (Doc. 117-1, at 44.)[6] The accountant further stated that without

"foundational documents" he could not determine whether Exel was in "compliance with a contractual covenant...." and needed to know "how much revenue was paid to Exel by Sears for the pick-ups and deliveries handled by the Plaintiffs." *Id.*

Plaintiffs' memorandum (Doc. 118) was no more helpful. It made sweeping statements about the need for additional records but failed to describe the specific documents that were needed or explain how the documents would reveal what Sears paid for particular deliveries made by Plaintiffs. For example, Plaintiffs argued that "payment records" of Sears "hold the secret as to whether Exel violated its guarantee that Plaintiffs would each receive 'a minimum of sixty percent (60%) of hauling revenue' received from Sears for the deliveries that Ruffin and Baker handled during 2007-2009." (Doc. 118, at 1.) But Plaintiffs already have been offered copies of the invoices that Exel sent to Sears for deliveries from the Thornton site during the relevant period, which would include any deliveries made by Plaintiffs. Plaintiffs' counsel was unable to explain to this Court during oral argument what value there would be in Exel obtaining and producing copies of the checks that Sears sent to pay such invoices. Such checks would be in a lump sum to cover all deliveries for all drivers at the Thornton location for a particular week. Such a check or payment would not specify what Sears paid for the specific deliveries made by Plaintiffs. Documents already produced by Exel, however, provide the information needed to determine this. They also inform Plaintiffs how much of the Sears revenue was *not* included as hauling revenue and why (e.g., 30% of miscellaneous fixed expenses and all of the management fee).

In conclusion, Plaintiffs have failed to persuade this Court that additional documents are necessary. They have also failed to identify specific documents that they seek despite being given multiple opportunities to do so. The oral motion to compel additional documents is denied.

1.  Following the retirement of Judge Anderson, the case was reassigned on October 29, 2010 to Judge Der-Yeghiayan. (Doc. 93.)

2.  Sears was required to pay the flat rate for certain *attempted* deliveries (e.g. refusals, returns, not-at-home, wrong address, go-back, and reschedules). (Doc. 122-4, at 4.)

3.  Exel provided Plaintiffs with information showing how the $2,710 daily payment by Sears for fixed expenses was derived. Exel converted the total annual fixed expenses as shown on Sears Rate Sheet attached to the Sears agreement ($986,445) into a daily figure (i.e., $986,445 ÷ 52 (weeks per year) ÷ 7 (days per week) = $2,710 (daily). (Doc. 122-3, at 10.)

4.  Exel added all of the annual fixed truck expense ($27,750 per month x 12 months = $333,000 annual) and annual fixed maintenance ($3,835 per month x 12 months = $46,028 annual), and 30% of the annual fixed miscellaneous expenses ($39,318 per month x 12 months = $471,816 annual x 30% = $141,545). The total is $520,573. Exel then divided this figure by the estimated annual number of stops set forth on the Sears Rate Sheet (95,893) to derive the figure of $5.43 per stop for inclusion as hauling revenue. (Doc. 122, at 4; Doc. 122-3, at 10.)

5.     The Sears agreement required Exel to send a bill to Sears each week with the actual miles for all deliveries from the Thornton site.  Sears then paid for fuel at the rate of 7 miles per gallon, using the local average gas price.  (Doc. 122-3, at 4.)

6.     According to the affidavit, the accountant was retained to "formulat[e] an opinion as to whether there were unresolved compliance issues in regard to the contractual promise extended by Defendant Exel Direct Inc. to the two Plaintiffs--i.e., that they were to receive at least sixty percent (60%) of the hauling revenue paid to Defendant by its sole client, Sears Roebuck & Co." (*Id.* at 43).  This misstates the compensation agreement in the ITAs.  Exhibit A stated that Exel would pay "a minimum of sixty percent (60%) of hauling revenue"; however, hauling revenue was not defined as 60% of what Sears paid Exel.  Rather, Exhibit A stated that "[t]he term 'hauling revenue' shall be interpreted in accordance with [Exel's] established accounting practices and past practices."  Exhibit A went on to describe certain revenue sources that would be *excluded* from hauling revenue.  (Doc. 122-2, at 5.)